Good morning, and may it please the Court. My name is Steve Mishuda, and I represent the appellants, NW Environmental Advocates. I'd like to reserve five minutes of my time this morning for rebuttal. With me at counsel table this morning is Mr. Todd True, co-counsel, as well as Nina Bell from NW Environmental Advocates. The estuary formed where the Columbia River meets the Pacific Ocean is vital to the NW salmon and to its economy. The U.S. Army Corps of Engineers' dredging and disposal actions in this sensitive area demand a comprehensive analysis. But that analysis of a number of harmful cumulative, direct, and economic effects from the channel deepening project and from channel maintenance are missing from the two EISs at issue in this case. The district court's ruling upholding those EISs should be reversed for four reasons. First, the Army Corps of Engineers failed to adequately consider the combined effects of removing massive amounts of sand from the coastal cycling system. Second, the Corps' economic analysis for the channel deepening project is inaccurate and misleading. It overstates the benefits of the project, and it underestimates its cost. Third, the Corps failed to consider the potential for the channel deepening project to mobilize toxic contaminants into the food chain. And finally, the Corps failed to address the effects of allowing saltwater to intrude further into the estuary. I'll start this morning by talking about cumulative effects and the economic analysis, and then I'll turn briefly to the direct effects issues involving toxics and saltwater intrusion. Counsel, this case comes to us by a grant of summary judgment. Correct. So my understanding is that if we were to find that there were certain material facts which were in dispute, we would have to send it back for trial? Or do we ask the agency to do a further evaluation? I think the latter, Your Honor. This case is also under the Administrative Procedure Act. There is an administrative record that both the Corps and the National Marine Fisheries Service produced for these actions, as well as a number of materials that were before the district court. And so the facts in that record aren't necessarily in dispute. I think we'll be talking a lot about what exactly those facts are today. But the EISs and the record of decisions should be remanded back to the agency for preparation of a new document under NEPA. Turning to my first point about the cumulative effects, the Corps failed to analyze cumulative impacts from the Channel Deepening Project when combined with the effects of the Mouth of Columbia River, or MCR, project. And those cumulative effects involve the effects of erosion on the coasts and on the jetties that protect the river mouth. Are you saying the Corps didn't go through this analysis? They didn't study those effects? Yes, that's correct, Your Honor. And more specifically, the Corps did not study the effects of removing sand as part of the Channel Deepening Project, as well as removing sand from the MCR project and then taking that sand outside of the coastal cycling system. And these are the impacts that, for example, have caused an ongoing coastal erosion problem on the coasts of Washington and Oregon today. And both of those projects combined will exacerbate that problem. The Columbia River once supplied sand to the coasts of Washington and Oregon, but today that natural flow of sand has reversed. The coasts of those two states are now actually eroding back into the river, and the river mouth is literally sucking sand from the coast back into the river mouth. Now, the problem is so severe that the majority of the sand that the Corps dredges at the river mouth every year as part of its MCR project is actually coming from the coast. The Channel Deepening Project includes the establishment and use of a deep-water ocean disposal site for sand from both the Channel Deepening Project as well as the MCR project. What do we make of the current contention that they're not going to do ocean dumping for 20 years? Your Honor, it's very unclear throughout the record, but I believe in the Federal Appellee's response brief, we do have a figure pinned down, I think, of 12 million cubic yards will go from the Channel Deepening Project out to the deep-water site. I think as a point that's worth noting is that they're already using the deep-water site, which was used for the first time last summer, and so we're already taking sand from the river in the mouth and putting it out in the deep-water site today. Now, there's no dispute that that deep-water site was sized to accommodate 225 million cubic yards of sand, and while the Corps makes some issue of the fact that it might not use that full capacity in this appeal, it's also undisputed that taking that sand from the MCR and the river takes it out of the coastal cycling system. So once it's dumped out in the deep ocean, it's gone. It's not available to replenish the sand on the coast. The Corps admits in a single statement that taking that much sand from the coast over the next 50 years would have, and this is a quote, profound impacts, but aside from that single statement, which we have buried in an appendix, there's no real analysis of what those impacts might be or how they might accumulate with the impacts of the Channel Deepening Project. The District Court held that the Corps properly categorized the MCR project as a cumulative impact, but it didn't address our claim that the Corps failed to properly analyze those cumulative impacts. Instead, the Court looked at the direct effects of taking sand from only the Channel Deepening Project out of the system that's analyzed in a document called Exhibit J to the Environmental Impact Statement for Channel Deepening. Now, Exhibit J isn't a cumulative impacts analysis of taking sand from both the river and the MCR project Instead, it looks only at the river and looks at the effects of taking 70 million cubic yards of sand out of the river over the life of the Channel Deepening Project and what that might do to sand movement within the river itself and then generalizes based on that that the project won't have any effects on the coast. But whether sand continues to move downstream in the river is only part of the picture when you're talking about erosion of the coast and the jetties. The MCR project interrupts the flow of sand from the river out to the coast and so you can't make determinations about the impacts on the coast without considering this MCR project. Wasn't the MCR project separately considered in a prior statement? The MCR project was considered in a 1983 EIS, but what's new here is that 1983 EIS didn't consider the deep water disposal of sand. That's a new proposal that the Army Corps of Engineers included in the EIS for the Channel Deepening Project, included it as part of the Channel Deepening Project, because in the 23 years we've had since 1983, the places where they were dumping sand from the MCR have filled up largely to capacity. They can still use them somewhat now, but they needed a new place to put the sand and that deep water disposal site is proposed and considered for the first time in this EIS. So really, the MCR interrupts the flow of sand to the river and that means that you can't assume that any sand that flows down the river will reach the coast. Exhibit J, when it talks about sediment and it talks about sand movement, it doesn't mention anything about, it does mention the MCR, we would concede that, but it only talks about the MCR project in terms of past actions. It doesn't say anything about future dredging from the MCR and there's nothing in Exhibit J that talks about the 225 million cubic yards of sand that the Corps plans to remove from the MCR and place in the deep water site. NEPA requires the agency to consider the cumulative impacts of dumping sand from the river channel and from the MCR project on the coastal cycling system. Exhibit J looks at only sand from the river channel and so can't satisfy that. The Corps' failure to examine these significant environmental impacts in the Channel Deepening EIS renders that EIS invalid. Your opponents contend that the harm to the jetties and the erosion isn't being caused by this new project so that they don't have to pay any attention to it. I gather that's what they're telling us. I believe that is their contention, Your Honor, and there's one big problem with that, and again it comes back to this, you can't make the determination about the river project by just looking at an arbitrary section of the river and not including the MCR. Talking about the cumulative impacts on coastal erosion and jetty erosion demands that we look a little bit broader than just what the Channel Deepening Project will do. The states of Washington and Oregon submitted extensive comments during the public comment period on these EISs talking about how the estuary today functions as a sediment sink and how the Corps' project, both the MCR, the cumulative effects from the MCR, as well as the Channel Deepening Project would either enhance or at least maintain the ability of the estuary to keep bringing in sand from the coast. What do we make of the fact that both Oregon and Washington eventually said okay? Your Honor, the appellees do make much of this, and I think the district court noted this as well. The sign-offs, as they were, by the states of Washington and Oregon under the Clean Water Act and Coastal Zone Management Act don't really have any bearing on the Corps' NEPA analysis for two main reasons. First, if you look at those documents, especially the state of Oregon, it's clear that Oregon signed off on the project for whatever reason, despite having severe reservations about the adequacy of the Corps' analysis. And I'll quote. This is from tab 29 in our excerpts of record at page 386. When signing off, the state of Oregon said, quote, the Corps does not directly address the potential for channel deepening to influence transport of literal sediments into the estuary and the potential loss of these sediments through the estuary acting as a sediment sink. They then go on to refer the Corps back to the comments they made during the EIS process. Washington, for its part, also heavily conditioned the use of the deepwater site because they didn't believe that the Corps looked at this issue enough. And then second, as a matter of law, whether or not the Corps received permits under the Clean Water Act doesn't have any bearing on whether or not its NEPA analysis is correct. And that's in a long line of cases from this court and others that are cited in our brief. Turning to my second point, the Corps has presented an incomplete and misleading analysis of the economic costs and benefits of the channel deepening project, addressing the costs first. The key point here is that the EIS doesn't discuss the significant costs associated with permanent removal of sand from the coastal system, and it doesn't discuss those costs because, of course, it doesn't consider them as an environmental impact either. These issues were raised during the comment period, but the Corps ignored them. The comments reveal that these costs are also very significant. The Washington Department of Fish and Wildlife, for example, noted that coastal erosion has cost the state of Washington over $100 million in the past 10 years. The Corps' own reports in the record identify that the cost of rebuilding the jetties, just 20 percent of the jetties that are currently eroding, would cost from $140 to $260 million. None of those costs are included in the Corps' cost-benefit analysis, and including even some of them could radically alter that ratio. The Corps' analysis also falls short on the benefits side of the ledger. The Corps predicted that the majority of the benefits from channel deepening would come from increased efficiencies that would accrue to container shipping companies, and then assumed that because those efficiencies, because they would be saving money, they would pass those savings on to U.S. entities that would then ship more from the Port of Portland. The problem with this is that any increase in business at the Port of Portland necessarily comes at the expense of business from other ports, and an adequate cost-benefit analysis under NEPA should show that we're producing a net benefit to the U.S. economy, and not just robbing Peter to pay Paul by moving business from one port to another. These flaws add up to an incomplete picture presented to the public and to the decision-makers in Congress and elsewhere, and the EIS should be invalidated. I'll turn very briefly to my final two points about toxics and saltwater intrusion. The toxics point, there's a lot in the briefs on this, but it really comes down to the fact that the Corps didn't adequately address the potential for channel deepening to mobilize toxic sediments that might be trapped in areas outside the channel. Experts from state and local agencies and the public all raised this issue with the Corps, but the agency ignored it, and the Corps' failure to address that significant direct impact renders the EIS invalid. And finally, the Corps also didn't adequately address the potential for significant impacts from further changes in saltwater levels in the estuary. The channel deepening EIS looks only at a one-mile increase in saltwater intrusion and then calls that increase insignificant. The problem with that finding and that prediction is that it isn't anchored to an understanding of where we're starting from. Without some understanding of past changes, what actions have caused those changes, and the effects on fish and wildlife, we can't know whether the next increment is significant or not. The Corps can't point to the EIS for maintenance of the 40-foot channel as a place where this analysis is done because it's not contained in that document either. Capturing the additive effects of these incremental impacts over time is the whole point of NEPA's cumulative impacts analysis. That wasn't done in either the channel deepening EIS or the EIS for the maintenance of the 40-foot channel. In sum, both the channel deepening EIS and the channel maintenance EIS fail to address the important environmental and economic effects as NEPA requires. For these reasons, this Court should reverse the district court's ruling and remand those EISs to the Army Corps of Engineers for preparation of documents that comply with NEPA. Thank you. Appreciate it. Thank you. Good morning. May it please the Court. Matthew Sanders for the Federal Appellees. Sitting with me at counsel's table is Beth Ginsberg for the interveners. Ms. Ginsberg and I have agreed to share our time today with me speaking for about 14 or 15 minutes. In a model for informed decision-making and with NEPA working at its very best, in this case the Corps fully evaluated the potential environmental consequences of its proposal to deepen part of the Columbia River by three feet. The Corps over a 10-year period compiled a 42,000-page administrative record that includes two environmental impact statements, two biological assessments, and four biological opinions. The Corps also convened independent panels of scientific experts and economists, all of whom affirmed the reliability of the Corps' analyses and conclusions in this case. In the states of Washington and Oregon, the main proponents of the concerns that the plaintiff refuses to let go have now certified the project. Despite having four public comment periods and two environmental impact statements upon which to make comments during those periods, the plaintiff offers no evidence that the Corps has overlooked any important issue. Let me first address the cumulative impacts issue more specifically. The Corps in this case fully studied the project's cumulative impacts, including the deepwater disposal of sediment from the channel deepening and MCR projects. Despite no obligation to do so, the Corps considered the worst-case scenario of disposing of up to 225 million cubic yards of sediment in the deepwater site and, as the plaintiff acknowledges, concluded that doing so would in fact have significant adverse effects on sediment budgets and coastal erosion. As a result, and as proof that NEPA worked and did its job by informing the agency's decision-making, the Corps decided and proposed to dispose of most or all of the sediment from those projects at sites that keep sand within the active sediment transport system. The plaintiff has built his case around a scenario that the Corps has never proposed to undertake, and that is the Corps has never proposed to dispose of all or even the majority of sediment from the channel deepening and MCR projects in the deepwater site. What do we know about the sites which they now say they're going to put the sand on? Well, in the record, the Corps is very clear that it plans to dispose of most, if not all, of sediment from the MCR project, that is 4 to 5 million cubic yards of sediment per year, in sites that are dispersive, that is, disperse sand disposed of there to the lower Columbia River and coastal systems. The Corps also—I'm sorry? My concerns were more specific. First, they were planning to take it to the ocean. Now they say, no, we can dispose of it within the river, but they don't really tell us where or how or what those impacts would be. Well, the Corps explains in the 2003 EIS that roughly 12 to 37 million cubic yards of sediment from the channel deepening project will be disposed of in the deepwater site. That means that 53 to 78 million cubic yards of sediment will be disposed of at in-water and upland disposal sites, many of which keep sand within the active sediment transport system. But the Corps here determined that even if all of the sediment from the channel deepening project were disposed of in the deepwater site, that is, no matter where the sediment from this project is disposed of, the project will not have any meaningful effect on sedimentation or coastal erosion because it will not reduce meaningfully the available sand supply in the river or alter the river's capacity to move that sand. Thus, whether considered individually or collectively with other actions, the channel deepening project will not have any meaningful impact on sedimentation or coastal erosion. And the states of Washington and Oregon raised this issue vociferously in their comments when they denied certification for the project following publication of the 1999 EIS. The Corps, in response, went back, prepared Exhibit J and many other analyses to determine whether, in fact, the project would have any significant impact on coastal erosion or sediment budgets and concluded, based on those thorough analyses, that, in fact, it would not. And then the states of Washington and Oregon issued their concurrences for the project. Now, the plaintiff argues here today that those concurrences really have no bearing on the adequacy of the Corps' NEPA analysis. That could not be further from the truth. The main proponents of the concerns that the plaintiff repeats in this appeal, again, were the states of Washington and Oregon, and they issued concurrences indicating that they were satisfied that the Corps had adequately addressed their concerns. Yes, those concurrences contained conditions, but those conditions are reasonable and expected conditions designed to make sure that there are no unanticipated effects that occur. What am I to make of the fact that Washington wanted the Corps to consider sand dumping in the areas where bad erosion is taking place on the Washington coast, and this Corps said, we're not going to do that unless you pay for it, state of Washington? Well, the Corps, there was a lot of talk about disposing of more sediment near the ocean shore, near the coast. We're all aware of the terrible erosion up by Topeland. They were losing 30 feet a year. And I'd like to make a point about that in a minute. But the Corps determined that the most effective way to address the erosion problems and the instability of the MCR jetties was to dispose of most or all of the sediment from these projects at Expanded Site E, the shallow water site that EPA designated in 2005. And the Corps has every intention of doing that, and its historic practice bears out that intention. Between 1907 and 1997, the Corps disposed of 60 percent of sediment from the MCR project at sites that keep sand within the active sediment transport system. And since 1997, that figure is 90 percent. The EPA designated the deep water site because it concluded that other near shore sites that would have similar effects to the Expanded Site E were impracticable and, in fact, would have more environmental consequences than the deep water site. I would direct the Corps' attention to the Federal Register notice that EPA issued for the deep water site, which we cite in our brief, 70 Federal Register 10041, specifically pages 10046 and 5-1, in which EPA describes the NEPA process that it and the Corps undertook to evaluate the effects of disposing of sediment from the channel deepening and MCR projects in the deep water site, and in which EPA also explains that the deep water site will be used, as is consistent with the states of Washington and Oregon's concerns, only for sediment when the shallow water site is unavailable for use. EPA also explains that the capacity of the deep water site, 225 million cubic yards, is that large because for two reasons. One, it doesn't want to go through this cumbersome designation process again, and two, the deep water site, in fact, has fewer environmental consequences than a larger number of shallow water sites near to the ocean. Where do I find in the record an analysis of the deep water sites, what's happening to the critters that are there? I would direct the Court's attention to a number of places. First, the 1999 EIS, specifically Appendix H, which is at Supplemental Excerpts of Record, pages 1702 to 1989. I would also direct the Court's attention to the 2003 EIS, specifically the Cumulative Impacts Discussion between pages 346 and 382 of the Supplemental Excerpts, and Exhibit J, which is at pages 409 to 77. Well, I have Exhibit J from cover to cover. It doesn't have anything to do with the ocean bottom. That's what I'm— Oh, no, you're right. With respect to the ocean bottom, your best source would be Appendix H to the 1999 EIS, the first citation I gave you. Another point that I'd like to make is that the plaintiff paints a certain story about the current state of conditions in the lower Columbia River system and leaves the reader to assume that the erosion that's occurring along the coast and the instability of the MCR jetties is a result of what the Corps has been doing and what it proposes to do. That could not be further from the truth. Consider, for example, the plaintiff's citations to excerpts of record, their excerpts of record, pages 108 and 608. Those citations come from documents that, read in their entirety, make clear that the coasts are eroding as part of a natural equilibrium. That is, as Exhibit J makes clear, sediment transport to the coast has been undergoing a long-term decline over the last 10,000 years. The coasts are returning to their natural equilibrium in which they are eroding. That equilibrium was disturbed by the construction of the MCR jetties, which caused the ejectment of a large amount of sand that has been continuing to accrete to the coast, but that effect is wearing off. Nothing the Corps is doing is altering that natural balance. In fact, if you read the report that surrounds page 680, which they rely heavily upon in their opening and reply briefs, that report makes clear that the Corps' disposal practices of disposing of most or all of the sediment from its projects at dispersive sites near the coast have the effect of, to the extent possible, mitigating coastal erosion and stabilizing the MCR jetties. The plaintiff relies upon scattered statements and draft documents to paint a misleading and inaccurate picture of the current conditions and how the Corps' actions have affected and will affect those conditions. The Corps prepared an incredibly thorough analysis here in which it concluded very reasonably that the channel deepening project is not going to have any meaningful effect considered alone or collectively with other actions. With respect to the economic costs issue, the Corps' economic analysis, the Corps did not consider whether the project is going to have economic costs due to increased erosion and instability of the MCR jetties because the project is not going to cause those effects. And the Corps is very clear about that. The Corps also used conservative estimates of the project's economic benefits and, in fact, assumed that Portland's market share of cargo would decline over time and still found that the project would have net economic benefits. Where could they get that 14 percent figure for decline? I mean, I couldn't figure out whether that was picked out of thin air or whether it had some rational basis. Well, I'm not sure which figure specifically you're referring to. Are you talking about the decline in? The assumed 14 percent decline in Michigan. Well, I think that was based on historic figures and also based on, again, here the Corps did two economic analyses and concluded in the second supplemental analysis that even if Portland's market share declined over time, the project would still have net economic benefits. And an independent panel of economists affirmed the adequacy of the Corps' analysis and, in fact, stated that a multiport analysis, which the plaintiff continues to insist was necessary, was not necessary and would not tip the scales. Something just kind of common sense that struck me, Grays Harbor is now put in a facility for handling grain, and I would assume that that would have some substantial effect because we're talking mainly about the shipment of grain that comes down from eastern Washington through to the Columbia River system and then shipped out. I could see a scenario where possibly all or most of the grain would go out through Grays Harbor. Ships don't like the Columbia River. We all know that. Certainly a feisty river. I don't know specifically about that, but the Corps was charged with assessing what was reasonably foreseeable in terms of changes in market share and changes in shipping companies, and the Corps' economic analyses certainly account for that. I think the Corps satisfied that duty here. I'd like to leave Ms. Ginsburg with the remainder of my time, and I'm hopeful that she can address both sediment contamination and salinity. But the final point that I'd make is that in a system as complex and dynamic as the Columbia River, there is always room for additional study, and the Corps continues in its efforts to better understand that system. But NEPA only requires a reasonably thorough discussion of the probable environmental consequences of an action, and the Corps has ably met that standard here. The district court's judgment for the appellate should be affirmed. Thank you. Thank you very much. Ms. Ginsburg. May it please the Court. My name is Beth Ginsburg. I'm with the law firm of Stowell Reeves, and I have the honor today of representing the six lower Columbia River sponsor ports, who together put up a lot of money in support of this project, spent 10 years facilitating environmental review, and helped effect an appropriation from the states of Washington and Oregon that amounted to a total of $55 million, coupled with an additional $34 million from federal Congress. This project is vital to the region. It's vital because the channel, as the Court knows, is the gateway to international commerce. The channel affords the nation and the region cost-effective transport for literally billions of dollars of commerce a year. The channel is the third largest grain handling area in the world, and it is also the biggest wheat export area in the country. Let me turn directly to the cumulative effects argument. I think Mr. Sanders handled it very well and answered most, if not all, of the Court's questions. Mr. Mishuda started out by saying the district court didn't answer this question. And the reason the district court didn't answer the question is because these plaintiffs hid in the weeds. This issue wasn't presented to the district court. If it was as important as they're contending today on appeal at the 11th hour, one would have thought they would have raised it to the core. First, in the administrative process, there were four public opportunities for review. What didn't they raise? They didn't raise the issue of the sand supply transport issue. They didn't raise it at all. Say that again. I'm not clear what the issue is. These plaintiffs were required, as a matter of administrative law, to exhaust their remedies to actually present this issue of the two issues, the issue of sand supply and erosion and the cumulative effects that that takes, that removal of that amount of sand from the project area and from the MCR is going to cause adverse effects with respect to sediment disposal out in the deep water. They didn't raise this issue below. Nowhere. That's why Judge Martinez didn't review it. He reviewed what they presented them. So that's a fundamental problem. Another fundamental problem with their claim is this. There's a certain futility about it. They didn't challenge the MCR action, and they didn't challenge EPA's designation of the deep water site. This court is actually powerless to redress their real concerns because if you read their briefs, they're not concerned with the direct effects associated with the channel improvement projects, effects on sand supply. They concede those. They concede those are significant. They're totally fixed on the cumulative effects presented by those other projects and those other approvals. They didn't challenge them. Let me direct the court's attention to 70 Federal Register 10046-51. That's EPA's approval of the deep water site. EPA absolutely makes clear that it's not going to allow the court to take all this material to the deep water site, no. It approved the designation of that site for 50 years for all the sands that are going to be dredged in this area, that is the MCR, the river, the estuary, for 50 years. It includes the known projects and future unknown projects that might arise in the next 50 years. It sized it big so it wouldn't have to go through this process again. So the plaintiffs are patently false about this 225 MCY issue. It's just a red herring here. Moreover, the states of Oregon and Washington and EPA are requiring the court to actually conduct annual monitoring of the sediment supply and transport and erosion and to employ an adaptive management program. That is to say, they're collecting new information all the time. NEPA could require no more. There would be no reason to send this back because the information is ongoing,  employing an adaptive management program to make sure that these sands stay within the near shore and replenish the littoral cell. So that, I think, just puts a nail in the coffin on this issue. Let me briefly turn to toxics because Mr. Sanders didn't get a chance to address that. This was the very issue that led NOAA Fisheries to take back its initial biological opinion and employ a new panel of independent peer-reviewed scientists to look at the question, are there toxics that are problematic in the river? Counsel, I looked in the record to see if I could find out what kind of testing had been done to the areas on the sides that were going to slope off. What kind of testing was done there? The court conducted 4,000 samples. It analyzed 600 of them. Yeah, but where were they taken from? They took samples throughout the river channel. They took them in every area they thought they were going to find toxics, and they presented that issue to the Sustainable Ecosystems Institute panel, a panel of a number of scientists from across the country independent of this project. It had nothing to do with the Corps. They were predisposed to find a problem. Their hearts were in looking for a problem. They didn't find one. They did not find one. Nor could they find that there was an erosive area that the Corps didn't find itself. There are only five of them. So this notion that the plaintiffs have put forward, that there are erosive areas up and down the river, is patently false. The SEI panel looked at that. They spent full days convening forums on this topic, and they found no evidence whatsoever of a toxics issue. Briefly, with respect to, if I may. Just sum up because you're over your time. The salinity issue, that's also a false issue. That issue was presented to the SEI panel. The SEI panel found that the salinity intrusion issue was absolutely immeasurable. In fact, it was in the same temporal variation as what happens naturally out in the river system. There would have been no point to go back and look at historic effects of prior actions to see, to piecemeal all that and get more information, because no new information would have led to a different result. The SEI concluded that, in fact, the Corps had the best available information on salinity intrusion, that the two models that the Corps used were the best available models that there were, notwithstanding some independent problems with each of them. They verified the results of each other, and the SEI panel was convinced the salinity issue was a nonissue. Thank you, Your Honors. Thank you, Ms. Ginsburg. Mr. Mishuda, you get the last word. You've got about four minutes left. Thank you, Your Honor. I'll start by addressing Mr. Sanders' statement that the 225 million cubic yards is somehow a worst-case scenario and that it's not really going to happen. But the point here is that that's what the Corps proposed. The 225 million cubic yards in the deepwater site is still the size of the deepwater site. In this EIS and in this process, they proposed that, and the duty to analyze the effects is triggered now. This EIS is the process where they have the duty to analyze those cumulative effects, and they didn't do it. Exhibit J, which has gotten a lot of attention yet again, I would reiterate, does not contain any future analysis of sand transport outside the river system and sand transport on the coast. It doesn't contain any future analysis from dredging from the MCR and dredging from the river. It contains an analysis of looking at the river. But again, the MCR, the 225 million cubic yards that may come from there and may be put in the deepwater site, despite the objections of States and EPA over the years, that's still the size of the site. That's not analyzed anywhere in Exhibit J. Counsel, will you address the issue of what you, in fact, raised to the district court? Yes, Your Honor. Your Honor, I find that claim a bit curious because we did raise this issue to the district court. I believe we cited in our reply brief the exact pages of our briefs, which the appellees included in their supplemental excerpts of record, where we raised this issue and asked the district court to address it. And I think if you look at the transcript of oral argument, the cumulative effects of this sand transport was actually talked about by both plaintiffs and defendants. You raised it with the district court? Raised it with the district court. With the agency. They say you didn't raise it with the agency. And also raised it with the agency. I can point the court to our client's comments. Those are at supplemental excerpt of records, pages 778 to 823 and pages 4269 to 4289. Did you raise cumulative effects in general or did you raise it with specificity concerning the MCR project? Well, here's a quote from those comments from page 4288 of the supplemental excerpts. And that is, quote, The cumulative impact of disposing of sand in the deepwater site will result in its permanent waste because it will be irretrievably lost. And the sand should not be wasted in deepwater because it exacerbates the cost from erosion, habitat loss, and degraded coastal infrastructure. There are many more. You didn't mention the mouth of the Columbia River. Well, and it goes on to talk about the mouth of the Columbia River at other pages, page 4275 of the record as well. And I think the overarching point here is those comments were careful. Our client was, and we were aware of the fact that the states of Washington and Oregon submitted extensive comments on this. And those comments are incorporated specifically by reference, rather than repeating everything the state said at page 4289 of the supplemental excerpts. And, again, the court has never required the commenters from the public or elsewhere to raise the precise legal articulations of issues, and that's discussed in the Native Ecosystems Council case that we cited in our brief, and also in a case called Idaho Supporting Congress v. Rittenhouse, which is at 305F3rd at page 966. And then, finally, I just want to turn to toxics. I think Judge Fletcher asked where there is an analysis. The 4,000 samples that Ms. Ginsburg cited are not a comprehensive analysis, and I'm not sure how we can say whether or not those were taken from all over the river because there's nothing in the record to indicate where those samples came from. There's no maps that correlate them. And, again, there's fundamental problems with those 4,000 samples. Only 586 of them were analyzed for toxic contamination at all, and only a handful of them, I think 40 or so, are actually current. A lot of them date back to the 1970s before the river was even deep into its existing levels. Thank you, Your Honors. Ms. Shuda, thank you. Mr. Sanders, Ms. Ginsburg, thank you as well. The case just argued is submitted.
judges: O'scannlain, Silverman, Gould